MACHETE'S CHOP SHOP,
INC., Appellant

v.

The TEXAS FILM COMMISSION;
Heather Page, as Director of the Texas Film Commission; The Music,
Film, Television, and Multimedia Office, Office of the Governor; and Greg
Abbott, as Governor of the State of
Texas, Appellees

NO. 03–14–00098–CV

Court of Appeals of Texas,
Austin.

Filed: January 29, 2016

D. Todd Smith, Maitreya Tomlinson, Smith Law Group, LLLP, Austin, TX, for Appellant.

Rance Craft, Office of the Attorney General, Erika M. Kane, Assistant Attorney General, Austin, TX, for Appellee.

Before Justices Puryear, Pemberton, and Field

### OPINION

Scott K. Field, Justice

Machete's Chop Shop, Inc. (Machete) sued the Texas Film Commission (the Commission); the Music, Film, Television, and Multimedia Office (the Office), Office of the Governor; Heather Page, in her official capacity as Director of the Texas Film Commission; and Greg Abbott,[1] in his official capacity as Governor of the State of Texas, (collectively, the State Defendants), seeking declaratory relief regarding the Commission's handling of Machete's application for a grant from the State's Moving Image Industry Incentive Program (the Program). *See* Tex. Civ. Prac. & Rem. Code §§ 37.001–.011 (UDJA). Machete also sought a declaration that a statute and two rules governing the Program were unconstitutionally vague or, in the alternative, that the rules were invalid as applied to Machete. *See* Tex. Gov't Code § 2001.038 (permitting challenge to validity or applicability of agency rules). The State Defendants filed a plea to the jurisdiction, asserting that the suit was barred by sovereign immunity.[2] The trial court granted the plea to the jurisdiction without specifying the ground on which it relied and dismissed Machete's claims against the State Defendants. Machete appeals. We will affirm the trial court's judgment.

### BACKGROUND

The Moving Image Industry Incentive Program is a grant program established by the Legislature and administered by the Music, Film, Television, and Multimedia Office[3] for production companies that produce moving image projects in the state. *See id.* § 485.022(a). To qualify for a grant, a project must meet certain statutory requirements for levels of in-state spending, in-state filming, and employment of Texas residents. *Id.* § 485.023(1)-(3). Even if a production company meets those statutory requirements:

---

1. This appeal was originally filed in the name of Rick Perry, predecessor to the present Governor of the State of Texas, Greg Abbott. Abbott has been automatically substituted as an appellee pursuant to Rule 7.2(a) of the Texas Rules of Appellate Procedure. All references to the Governor in this opinion will be to Abbott.

2. The State Defendants also challenged whether Machete was the actual "grant applicant" with standing to bring the suit, but abandoned that argument after Machete amended its petition to cure the alleged jurisdictional defects.

3. The Music, Film, Television, and Multimedia Office is established in the Office of the Governor. *See* Tex. Gov't Code § 485.002.

the [O]ffice is not required to act on any grant application and may deny an application because of inappropriate content or content that portrays Texas or Texans in a negative fashion, as determined by the [O]ffice, in a moving image project. In determining whether to act on or deny a grant application, the [O]ffice shall consider general standards of decency and respect for the diverse beliefs of the citizens of Texas.

*Id.* § 485.022(e). The Office assigned administration of the Program to the Commission which, pursuant to legislative directive, developed administrative rules to govern the procedure for the submission of grant applications and the awarding of Program grants. *Id.* § 485.022(b); 13 Tex. Admin. Code §§ 121.1–.14 (2010) (Tex. Film Comm'n, Texas Moving Image Industry Incentive Program).[4] As did the statute, the rules implementing the Program also permitted the Commission to deny a grant application based on "inappropriate content or content that portrays Texas or Texans in a negative fashion." *See* Tex. Admin. Code § 121.4(b) (2010) (Tex. Film Comm'n, Ineligible Projects). Specifically, Rule 121.4(b) provided:

Not every project will qualify for a grant. The State of Texas is not required to make grants to projects that include inappropriate content or content that portrays Texas or Texans in a negative fashion. As part of the preliminary application process, the Texas Film Commission will review the content document, and will advise the potential applicant on whether the content will exclude the project from receiving a grant.

*Id.* Rule 121.14 also permitted the Commission to refuse to award grant money after a project's completion. Rule 121.14(a) provided:

An applicant's eligibility for funds can be revoked after the project is completed for reasons such as obscene or inappropriate content, failure to meet minimum qualification requirements, failure to provide requested documentation, providing false information, or inability to complete the project.

*Id.* § 121.14(a) (2010) (Tex. Film Comm'n, Revocation and Recapture of Incentives).

In 2009, Machete submitted an application for a grant in connection with its production of the feature film *Machete.* Thereafter, the Commission notified Machete that it had reviewed the application and "approved [it] for acceptance into the incentive program." The Commission also advised Machete that "approval of an incentive application does not guarantee payment of incentive funds." The Commission's director at the time, Bob Hudgins, also sent Machete a form titled "Initial Content Verification" in which the director stated that he had reviewed *Machete*'s initial content and attested that it fulfilled the initial content requirement for the Program.[5] Hudgins also advised Machete that this assessment of the initial project content "pertain[ed] only to the qualification of the application" and that "[i]f the final content is determined to be in violation of the rules and regulations of the incentive program, the project [would] not be eligible to receive funds" from the Program.

After *Machete* was released in September 2010, Machete provided the Commis-

---

4. All references to the rules are to the rules adopted by the Commission in November 2009, which governed the disposition of Machete's grant application in 2010.

5. The Program rules required an applicant seeking a grant for a feature film to submit a full script. *See* 13 Tex. Admin. Code § 121.8(a)(1)(C)(i) (2010) (Tex. Film Comm'n, Grant Application).

sion information verifying its final in-state expenditures, in-state production days, and employment of Texas residents. According to Machete, Hudgins resigned his position as the Commission's director effective November 30, 2010. On December 1, 2010, the Commission's deputy director, Carol Pirie, sent Machete a letter stating that "[b]ased on the final review of content, the feature MACHETE does not qualify for a grant from the Texas Moving Image Industry Incentive Program." Pirie informed Machete that the determination not to award the grant was pursuant to Government Code subsection 485.022(e), which provided that the Commission "may deny an application because of inappropriate content or content that portrays Texas or Texans in a negative fashion, as determined by the office." Tex. Gov't Code § 485.022(e). According to Machete, Heather Page, Hudgins's successor as the Commission's director, ratified the denial of a Program grant based on *Machete*'s content.

In July 2013, Machete sued the Commission and Page, in her official capacity as the Commission's director, and later amended its petition to add as defendants the Office, the Office of the Governor, and Abbott, in his official capacity as Governor of the State of Texas. Machete's suit was brought pursuant to the UDJA and asserted that (1) Page and Abbott had acted ultra vires in denying Machete's application for a Program grant; and (2) the phrase "substantial changes" in Government Code subsection 485.022(f), the phrase "extreme difference" in Rule 121.4(c), and the criteria for revoking a project's eligibility for a grant in Rule 121.14(a) were all impermissibly vague, both as written and as applied, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Course of Law provision of the Texas Constitution. Ma-

chete also challenged the validity of Rules 121.4(c) and 121.14(a) on the ground that they were unconstitutionally vague and did not further the Program's purpose. The State Defendants filed a plea to the jurisdiction seeking dismissal of the entire suit.

The State Defendants argued that sovereign immunity barred Machete's claims because (1) Machete was improperly attempting to use the UDJA to reverse an agency decision not subject to judicial review or to obtain other retrospective relief; (2) Machete asserted no viable ultra vires or constitutional claims; and (3) Machete failed to file suit within what they contended to be the applicable two-year statute of limitations. The trial court granted the plea to the jurisdiction and dismissed Machete's suit without specifying the jurisdictional ground on which it relied. Machete then perfected this appeal.

## DISCUSSION

In its first issue, Machete advances three arguments to support its assertion that sovereign immunity did not bar its suit. First, Machete asserts that it alleged valid ultra vires claims against Page and Abbott and, as a consequence, sovereign immunity did not apply to those claims. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 372–80 (Tex.2009) (explaining ultra vires exception to sovereign immunity). Next, Machete contends that it asserted valid constitutional claims under the UDJA that are not barred by sovereign immunity. *See Texas Dep't of Transp. v. Sefzik,* 355 S.W.3d 618, 622 (Tex.2011) (recognizing that UDJA waives sovereign immunity in suit challenging validity of statute); *Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality,* 307 S.W.3d 505, 515 (Tex.App.—Austin 2010, no pet.) (sovereign immunity waived by UDJA when claimant alleges facts demonstrating agency's action is unconstitu-

tional). Finally, Machete contends that Government Code section 2001.038 waives sovereign immunity for its claims challenging the validity of Rules 121.4(c) and 121.14(a). *See* Tex. Gov't Code § 2001.038.

**Does Machete's suit allege ultra vires acts such that sovereign immunity is not implicated?**

▮ Sovereign immunity extends to state officials acting in their official capacity. *See Heinrich*, 284 S.W.3d at 369–70. An exception to sovereign immunity applies when a party alleges that the government officer acted "without legal authority or failed to perform a purely ministerial act." *Id.* at 372. To fall within this exception to immunity, however, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* If the plaintiff alleges or ultimately can prove only acts within the officer's legal authority and discretion, the claim seeks "to control state action" and is barred by sovereign immunity. *Id.*; *KEM Tex., Ltd. v. Texas Dep't of Transp.*, No. 03–08–00468–CV, 2009 WL 1811102, at *2 (Tex.App.—Austin June 26, 2009, no pet.) (mem.op.). To determine whether Machete's pleadings allege facts demonstrating that the Commission acted outside its authority we construe the relevant statutory provisions defining the Commission's authority and evaluate whether the acts alleged are outside that authority. *KEM Tex.*, 2009 WL 1811102, at *4.

▮ Our analysis of whether Machete's suit is within the trial court's jurisdiction begins with its live pleadings. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004). The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause—in this case, with respect to its claims of ultra vires acts by Page and Abbott, allegations of fact that would demonstrate that they acted without legal authority or failed to perform a purely ministerial act. *See id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993)). When, as here, the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts. *University of Tex. v. Poindexter*, 306 S.W.3d 798, 806 (Tex.App.—Austin 2009, no pet.) (citing *Miranda*, 133 S.W.3d at 226). Whether the plaintiff has met the burden is a question of law, which we review de novo. *Id.* We construe the pleadings liberally, taking them as true, and look to the pleader's intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded an opportunity to amend. *Miranda*, 133 S.W.3d at 226–27. If, however, the pleadings affirmatively negate the existence of jurisdiction, a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to replead. *Id.* at 227.

**Did the Commission have legal authority to deny Machete's request for a Program grant?**

▮ In its live pleadings, Machete alleged that the Commission's decision to deny Machete's request for a Program grant was in contravention of the Program's enabling statute and the administrative rules implementing that statute and, therefore, ultra vires. Specifically, Machete contends that once the Commission, acting through its then-director Hudgins, "passed" *Machete's* content—by

which we assume Machete means that the Commission did not in its initial review of the script determine that it included "inappropriate content or content that portrayed Texas or Texans in a negative fashion"—the Commission's authority to deny the request for a Program grant was limited. According to Machete, once the Commission verified that "the content is in compliance with the rules and regulations governing the application process," it could not deny the Program grant unless, during the production process, "substantial changes" to the content had occurred, i.e., the final script deviated from the initial script provided with the application.[6] This is because, in Machete's view, once the Commission verified that the content was in compliance with the rules and regulations governing the application process, the only statutory authority for later denying the Program grant based on its content was Government Code subsection 485.022(f). That subsection provided:

Before a grant is awarded under this subchapter, the office shall:
 (1) require a copy of the final script; and
 (2) determine if any substantial changes occurred during production on a moving image project to include content described by Subsection (e).[7]

Tex. Gov't Code § 485.022(f). Machete reasons that because this subsection provided the sole authority for denying an application after the initial review, and because the final script of *Machete* did not differ from the script originally reviewed by Hudgins, the Commission had no authority to deny a Program grant based on the film's content, as it purported to do in reliance on subsection 485.022(e).

Machete has pleaded a valid ultra vires claim only if its construction of section 485.022 is correct and the statute contemplates a "two-step" review process with subsection 485.022(e) applying only to the first step, the initial review process, and not authorizing denial of a grant application thereafter. The jurisdictional inquiry, therefore, turns principally on the construction of a statute, a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex.2008). Our primary objective in construing statutes is to give effect to the legislature's intent. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex.2009). The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to absurd or nonsensical results that the legislature could not have intended. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see* Tex. Gov't Code § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We look to the entire act in determining the legislature's intent with respect to a specific provision. *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 190 (Tex.1981); *Northwest Austin Mun. Util. Dist. No. 1 v. City of Austin*,

<hr>

**6.** While Machete argues that the phrase "substantial change" is too amorphous a standard to be constitutionally applied by the Commission, for purposes of its ultra vires claims Machete contends, and the Commission does not dispute, that the written final script was the same as the script it submitted with its application.

**7.** Content described by "Subsection (e)" is "inappropriate content or content that portrays Texas and Texans in a negative fashion, as determined by the office." *See* Tex. Gov't Code § 485.022(e).

274 S.W.3d 820, 828 (Tex.App.—Austin 2008, pet. denied).

The question presented here is whether the statute authorized the Commission to deny a Program grant on final review of *Machete*'s content regardless of whether the project's final script differed from the script Hudgins initially reviewed and which he verified did not include content that made it ineligible for the Program. Machete asserts that the Commission was not so authorized and that, after "approving" the content of the initial script, it lacked authority to deny a grant unless the final script included a "substantial change" such that denial was authorized by subsection 485.022(f). Put differently, Machete maintains that, after the initial review, subsection 485.022(e) no longer provided authority for the Commission to deny a grant based on a film's content.

■ Machete identifies several ways in which it believes the plain language of the statute and administrative rules demonstrate that subsection 485.022(e) did not authorize the Commission to deny its grant application after the initial review. First, Machete points out that subsection 485.022(e) does not include the words "final review" and that it "does not mention a final review [or] its applicability to a final review." According to Machete, this omission "suggests" that its application is limited to an initial review. But subsection 485.022(e) also says nothing about an "initial review." There is nothing in the text of subsection 485.022(e) that expressly limits its application to any particular stage of the application process. Machete also points out that subsection 485.022(e) does not expressly state when the Commission may exercise its authority to deny a grant application. But again, neither does the statute identify any time or circumstance under which the Commission may *not* exercise its discretionary power. We will not read into a statute a limitation or prohibition that is not there. See *Walker v. City of Georgetown*, 86 S.W.3d 249, 256 (Tex. App.—Austin 2002, pet. denied).

Next, Machete asserts that subsection 485.022(e) does not expressly state that it provides the Commission with authority to "revoke" grant eligibility and, consequently, its application is restricted to the Commission's initial review of a grant request. While Machete advocates making a distinction between denying a grant application at the outset, which it concedes is authorized by subsection 485.022(e), and "revoking grant eligibility," which it contends is authorized only pursuant to subsection 485.022(f), the statute makes no such distinction, and we decline to import one in order to impose restrictions on the Commission's otherwise unfettered authority to deny a grant application based on content either "inappropriate" or that "portrays Texas or Texans in a negative fashion." Finally, Machete argues that the word "application" in subsection 485.022(e) is meant to connote only the "preliminary application process," and therefore indicates that this subsection deals entirely, and exclusively, with the initial application process and not with the final review process. As support for limiting the meaning of the word "application" to the "preliminary application process," as opposed to the entire time period before the Commission acts on an application, Machete points to the text of Rule 121.4(b). This rule provides that "[a]s part of the preliminary application process" the Commission will review the "content document"—in the case of a feature film, the script—and will "advise the potential applicant on whether the content will exclude the project from receiving a grant." See 13 Tex. Admin. Code § 121.4(b). According to Machete, the term "preliminary application process" in connection with the content review "sug-

gests" that the Legislature intended subsection 485.022(e) to be a limited grant of authority to deny an application based on content, which terminated after the initial content review was completed. But the same rule makes it clear that there will also be a final content review, and nothing in either the rule or in subsection 485.022(e) can be reasonably read to prohibit the Commission from denying an application based on content at that time.

■ Rather than attempt to divine legislative intent from what subsection 485.022(e) does not say, we instead consider what it does say, which is that the Commission "is not required to act on any grant application and may deny an application because of inappropriate content or content that portrays Texas or Texans in a negative fashion, as determined by the [O]ffice." [8] The statute's plain language admits of no temporal limitation on the Commission's authority. We are unpersuaded that the plain language of the statute manifests a legislative intent to limit the Commission's authority to deny a Program grant application based on content to the Commission's initial review of that request. Any such limitation must be imposed by something other than the text of subsection 485.022(e).

■ Machete argues that the structure of section 485.022 as a whole supports the conclusion that subsection 485.022(e) applies only when the Commission conducts its initial review of an application's eligibility for the grant Program. First, Machete contends that if subsection 485.022(e) authorized the Commission to deny a grant application at any time, then subsection 485.022(f) is superfluous. This argument depends on accepting Machete's view that

the purpose of subsection 485.022(f) is to authorize the Commission to deny a grant application after a project is completed. We do not read this section to confer authority to deny an application, but rather to require that the Commission obtain a copy of the final script of a moving image project for which a grant application has been submitted and, before awarding a grant, review it to "determine if any substantial changes occurred during production [ ] to include content [that is inappropriate or that portrays Texas or Texans in a negative fashion]." *See* Tex. Gov't Code § 485.022(f). This subsection simply does not speak to the Commission's authority to *deny* an application. Instead, it ensures that the Commission reviews the final version of the film's script before *awarding* a Program grant.

Machete also maintains that if both subsections 485.022(e) and 485.022(f) provide the Commission with authority to deny an application on final review after its completion, they are irreconcilable because they set forth different standards for denying an application for a grant based on content. According to Machete, the final project could contain insubstantial changes that would not authorize denial pursuant to subsection 485.022(f) but that would authorize denial pursuant to subsection 485.022(e). This argument fails, however, because it again incorrectly assumes that the purpose of subsection 485.022(f) is to confer authority on the Commission to deny a grant application post-production under certain circumstances rather than to direct it to review the final script before awarding a grant.

■ Additionally, subsection 485.022(f) cannot be read to create a "standard" for

8. Consistent with subsection 485.022(e), Rule 121.14(a) provides that "an applicant's eligibility for funds can be revoked after the project is completed for reasons such as ...

inappropriate content." *See* 13 Tex. Admin. Code § 121.14(a) (2010) (Tex. Film Comm'n, Revocation and Recapture of Incentives).

either awarding or denying a grant application. The statute does not direct the Commission to take any particular action based on its final content review. It does not require that a grant be awarded if no substantial changes occurred during production, nor does it require that the Commission deny a grant if substantial changes occurred during production that caused the film to include content that portrays Texas or Texans in a negative fashion. The decision to award or deny a grant remains within the Commission's discretion. Indeed, the only constraint on the Commission's authority is the mandate that "the [O]ffice shall consider general standards of decency and respect for the diverse beliefs and values of the citizens of Texas" when determining whether to act on or deny a grant application. *See id.* § 485.022(e).

▉ Finally, to support its view that the Commission's authority to deny a grant application based on content is limited rather than relatively unbridled, Machete points to Commission Rule 121.4(a), which provides that certain types of projects are ineligible for Program grants. *See* 13 Tex. Admin. Code § 121.4(a) (listing ten types of projects ineligible for Program grants including news, sporting events, award shows, and projects intended for undergraduate or graduate course credit). Rather than reflect some limited authority to award or deny Program grants to otherwise eligible projects based on content, this rule constitutes nothing more than a list of types of projects the Commission has itself determined are not eligible for consideration, regardless of how the Commission might view their con-

tent. The rule has no bearing on the scope of the authority conferred by subsection 485.022(e).

We conclude that the Commission's decision to deny Machete's request for a grant application after conducting the final content review was not beyond its statutory authority and was therefore not ultra vires. We will, however, address an implicit theme that is seemingly foundational to Machete's view that the statute should be construed to prohibit what it casts as the Commission's unauthorized "about-face" regarding whether the project qualified for a Program grant. The gist of Machete's position seems to be that the Commission should not be authorized to advise a grant applicant that a project's content does not exclude it from the grant Program and then, once the project has been made and the objective of the grant Program achieved—i.e., causing a film to be made in Texas using Texan actors—to deny the grant on the basis of its content if that content has not changed. In essence, Machete's argument is that once the Commission has made a determination, after its initial review of the film's script, that the content is not inappropriate and that it does not portray Texas or Texans in a negative fashion, it should be bound by that determination and have no discretion to make a different determination on final review of the project. One flaw in this argument is that it imports into the statute restrictions on the Commission's discretion that are extra-textual and rooted in notions of estoppel or reliance, concepts that have repeatedly been rejected when applied against the State.[9] *See, e.g., City of White Settlement v. Super Wash, Inc.,* 198 S.W.3d 770, 773 (Tex.2006) (explaining that

9. For example, in its live pleadings Machete alleged that "[t]he approval of the qualifying application induced the producers of Machete to spend millions of dollars in wages and other production-related expenses in the state

of Texas, which they did in reliance on the approval," and "[w]ere it not for the approval, *Machete* would have been produced elsewhere."

barring estoppel claims against government helps preserve separation of powers because legislative prerogative would be undermined if government agents could, through mistake, neglect, or intentional act, effectively repeal laws by ignoring, misrepresenting, or misinterpreting duly enacted statutes or regulations).

Moreover, Machete ignores the possibility that content not deemed to be inappropriate or to portray Texas or Texans in a negative fashion at a project's outset may, due to events occurring between the initial application and final completion of a production, come across entirely differently at a later date. Machete also does not consider that the initial content review is necessarily cabined to a review of a film's written script, while the final review could include viewing the finished feature film. The "content" reviewable at the post-production stage is more comprehensive and includes not just the written words of the script, but also the manner in which the words were spoken and the locations and costumes used by the actors delivering the lines of the script. One can easily imagine that a written script that did not seem inappropriate and did not appear to portray Texas or Texans in a negative fashion on paper might take on those attributes when converted into a film in which those words are spoken by actors and accompanied by all the other aspects that compose a feature film. Thus, a post-production decision that a project does, after all, include inappropriate content or portrays Texas or Texans in a negative fashion is not necessarily an "about-face" or reversal of a previous determination.

Construction of section 485.022 to provide the Commission with discretion throughout the entire grant approval process is not only reasonable but is the meaning undoubtedly intended by the Legislature when it specified that the Commis-

sion "is not required to act on any grant application and may deny an application because of inappropriate content or content that portrays Texas or Texans in a negative fashion." *See* Tex. Gov't Code § 485.022(e). Additionally, the absence of an applicant's right to judicial review of the Commission's decision on a grant application confirms the Legislature's intent to delegate broad discretion to the Commission to determine which projects will receive Program grant funds. *See Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 180 (Tex.App.—Austin 2013, no pet.) (absence of judicial review of Texas Historical Commission decision regarding content of historical marker confirmed Legislature's intent to delegate broad discretion to Commission to decide content). The denial of Machete's grant application, even post-production, was authorized by the statute.

**Did the Commission fail to perform a ministerial act?**

 Machete also asserted that, while the statute provides the Commission discretion to deny a grant in its initial review, after initial approval and post-production the statute requires the Commission to perform certain non-discretionary ministerial acts, and its failure to do so was an ultra vires act. Machete argues that, after the initial review, "the only colorable basis the officials had for revoking its grant eligibility was provided in Subsection 485.022(f) and former Rules 121.4(c) and 121.14(a), which do not provide discretion regarding whether a final review must be completed and the standards that would apply to revoke eligibility." Machete maintains that, in the present case, both the review and the award of a grant were ministerial acts because the final script did not differ from the original script. In Machete's view, subsection 485.022(f) establishes a "standard" such that the Com-

mission does not have the discretion to deny the grant unless the final script has a "substantial change" from the initial script. We disagree.

As previously discussed, subsection 485.022(f) does not set a "standard" or in any other manner constrain the Commission's authority to deny a grant. To the extent subsection 485.022(f) requires that the Commission perform any ministerial act, they are acts that must be performed "[b]efore a grant is *awarded*" under the Program, not before it is *denied*, as it was in the present case. *See* Tex. Gov't Code § 485.022(f) (emphasis added). The statute mandates that before a grant is awarded, the Office shall require a copy of the final script and determine if the content of the film has "substantially changed" to include content determined to be inappropriate or that portrays Texas or Texans in a negative fashion. *Id.* Subsection 485.022(f) has no apparent bearing on, and contains no directives whatsoever regarding, acts the Commission must take before denying a grant application. Subsection 485.022(f) would only come into play in this case if we accepted Machete's argument that the Commission, having approved the initial content, is bound to award a grant to an otherwise qualifying project unless the content has "substantially changed," a construction of the statute we have already rejected. Moreover, even were subsection

485.022(f) implicated, we do not agree that the actions it requires are ministerial. The Commission is not directed to simply compare the final script to the original script to discern whether there are any "substantial changes," but it is also charged with deciding whether those changes caused the final product to "include content described by Subsection (e)," which is content that, *as determined by the Office,* is "inappropriate content or content that portrays Texas or Texans in a negative fashion." That determination plainly calls for the exercise of the Commission's discretion and cannot be characterized as a ministerial act.

Machete's live petition does not allege acts by the Commission that were beyond its statutory authority nor does it complain of a state official's failure to perform a ministerial act. We therefore conclude that Machete failed to plead a valid ultra vires claim falling within that exception to sovereign immunity.[10]

### Did the trial court have jurisdiction over Machete's constitutional claim?

Machete also asserts that the trial court erred in granting the State Defendants' plea to the jurisdiction because sovereign immunity does not bar its claim under the UDJA that Government Code subsection 485.022(f) and Rules 121.4(c)[11] and 121.14(a)[12] are unconstitu-

---

10. Having so concluded, we need not address whether Machete's ultra vires claims seek impermissible retrospective relief, as the State Defendants contend. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 376 (Tex.2009) (discussing limits to remedies available for allegations of ultra vires acts).

11. This rule provided:

> Once an approved project has been completed, the Texas Film Commission will review the final content before issuing the grant, to ensure that revisions made during production have not created an extreme

difference from the content as initially approved.

13 Tex. Admin. Code § 121.4(c) (2010) (Tex. Film Comm'n, Ineligible Projects).

12. This rule provided:

> An applicant's eligibility for funds can be revoked after the project is completed for reasons such as obscene or inappropriate content, failure to meet minimum qualification requirements, failure to provide requested documentation, providing false information, or inability to complete the project.

tionally vague and, consequently, violate the due process and due course of law provisions of the United States and Texas Constitutions. *See* U.S. Const. amend. XIV, § 1; Tex. Const. art. I, § 19. Machete argues that the words "substantial change" and "extreme difference" are unconstitutionally vague and cause the statute and rules to fail to provide fair notice of the Commission's standards for awarding Program grants. We have already held, however, that subsection 485.022(f) does not articulate or impose any "standard" to be applied by the Commission in deciding whether to act on or deny a grant application. Rather, subsection 485.022(f) provides that, before awarding a Program grant, the Commission must review the final script to determine whether, during production, the content has been changed to include content that could permit—but not require—the Commission to deny the grant under the authority conferred by subsection 485.022(e). Because subsection 485.022(f) does not impose a standard or purport to supply the criteria for the Commission's decision whether to act on or deny a grant application, it cannot operate to violate Machete's due-process rights by subjecting it to arbitrary application of vague standards or exposing it to risk or detriment without fair warning. In short, subsection 485.022(f) does not implicate the due-process rights Machete claims it violates.

■■■ Correlatively, because the Commission's denial of Machete's grant application was pursuant to subsection 485.022(e), any declaration that subsection 485.022(f) is unconstitutional would not redress any injury Machete claims to have suffered so as to give Machete standing to challenge the statute. *See Gattis v. Duty*, 349 S.W.3d 193, 202–03 (Tex.App.—Austin 2011, no pet.) (UDJA claimant must meet standing requirements). And, to the extent the UDJA waives sovereign immunity for claims challenging a statute's validity, the claimant must be "a person ... whose rights, status, or other legal relations are affected" by the *challenged* statute. *See* Tex. Civ. Prac. & Rem.Code § 37.004(a). If Machete's rights, status, or other legal relations were affected, it was by the Commission's application of subsection 485.022(e), not subsection 485.022(f).[13]

Finally, with respect to Machete's claim under the UDJA challenging Rules 121.4(c) and 121.14(a), this Court has previously held that "that sort of claim falls outside the UDJA altogether." *Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman,* 408 S.W.3d 696, 708 (Tex. App.—Austin 2013, no pet.); *see* Tex. Civ. Prac. & Rem. Code § 37.004 ("A person ... whose rights, status, or other legal

*Id.* § 121.14(a).

**13.** We also observe that the Fifth Circuit has recently rejected a claim by Machete Productions, L.L.C., the film production company that produced a sequel to *Machete* called *Machete Kills*, that the Program is unconstitutional because it violates rights protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Machete Productions, L.L.C. v. Page,* 809 F.3d 281 (5th Cir.2015). The court held that because the Program statutes and regulations made clear that grants were discretionary, Machete Productions could not demonstrate that it had a clearly established right to the grant funds such that it had a property interest in a Program grant that triggered the Due Process Clause. *Id.* at 290. The court also held that the Program's statutes and regulations were not unconstitutionally vague. *Id.* (citing *National Endowment for the Arts v. Finley,* 524 U.S. 569, 588–89, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (holding that while Due Process Clause protects against "arbitrary and discriminatory enforcement of vague standards," when government "is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe")).

relations are affected by a *statute* [or] *municipal ordinance* ... may have determined any question of construction or validity arising under the *statute* [or] *ordinance* ... and obtain a declaration of rights, status, or other legal relations thereunder.") (emphases added).

### Rule challenge pursuant to Government Code section 2001.038

Machete also maintains that the district court had subject-matter jurisdiction over its cause of action for a declaration under Government Code section 2001.038 that Rules 121.4(c) and 121.14(b) were invalid. Section 2001.038 allows a party to challenge the validity or applicability of an agency rule through a declaratory judgment action if it is alleged that the rule or its threatened application interferes with or impairs a legal right or privilege of the plaintiff. *See Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 720 (Tex.App.—Austin 2009, no pet.). "Unlike the UDJA, section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity." *Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 123 (Tex.App.—Austin 2007, no pet.). Like other causes of action, a suit for a declaratory judgment under section 2001.038 requires the existence of a justiciable controversy to establish the trial court's subject-matter jurisdiction. *Id.* The justiciable controversy that Machete pleaded concerned its claim that the Commission's decision to deny a Program grant for the feature film *Machete* was unauthorized, which is, in essence, a claim that its application for a Program grant should have been granted, or, perhaps, not acted on. We have concluded that sovereign immunity bars Machete's UDJA claims seeking to invalidate the Commission's de-

nial of the Program grant, and there is no other right to judicial review of the Commission's decision. Machete's section 2001.038 claim for declaratory judgment is therefore moot. *See Bacon*, 411 S.W.3d at 181 ("Further, absent a right of judicial review from the THC proceedings or other claim to challenge them that is within the district court's jurisdiction, Bacon's section 2001.038 claim for declaratory relief is moot."); *Creedmoor–Maha Water Supply*, 307 S.W.3d at 526 n. 16 (agency's final, unappealable order rendered section 2001.038 rule challenge moot); *see also Texas Logos*, 241 S.W.3d at 123–24 (because relief provided under section 2001.038 does not extend to invalidating agency decision, but only rules by which proceedings were conducted, challenge to validity of those rules would amount to mere abstract, advisory opinion).

Having concluded that Machete's pleadings failed to allege valid ultra vires or constitutional claims under the UDJA and that its claims pursuant to Government Code section 2001.038 are moot, we hold that the trial court did not err in granting the State Defendants' plea to the jurisdiction.[14]

### CONCLUSION

For the reasons stated in the opinion, we affirm the trial court's order granting the State Defendants' plea to the jurisdiction and dismissing Machete's suit for lack of subject-matter jurisdiction.

---

14. Because of our disposition of Machete's first issue, we need not address its second and third issues, in which it argues that it timely filed its suit. *See* Tex. R. App. P. 47.1.